# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**PEGGY S. VALDEZ,**

      **Plaintiff,**

**vs.**                            **No. CIV 00-1777 MV/LCS**

**LARRY G. MASSANARI,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 9), filed July 27, 2001. The Commissioner of Social Security issued a final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is well-taken and recommends that it be **GRANTED**.

### PROPOSED FINDINGS

1.     Plaintiff, now forty years old, filed her applications for disability insurance benefits and supplemental security income on May 5, 1994, alleging disability commencing November 13, 1993, due to a mental impairment. (R. at 142-147.) She is a high school graduate with vocational training. (R. at 43.) Her past relevant work was as a data entry operator. (R. at 25.)

2.     Plaintiff's applications for disability insurance benefits and supplemental security

income were denied at the initial level on August 18, 1994, (R. at 161-167), and at the reconsideration level on January 19, 1995. (R. at 170-177.) Plaintiff appealed the denial of her applications by filing a Request for Hearing by Administrative Law Judge (ALJ) on January 23, 1995. (R. at 178.) The ALJ held a hearing on May 23, 1995, at which Plaintiff appeared and was represented by counsel. (R. at 36.) Plaintiff and Judith Beard, a vocational expert (VE), testified. (R. at 36-81.)

3.      The ALJ issued his first unfavorable decision on May 7, 1996, determining that Plaintiff was not disabled at step four because she could return to her past relevant work as a data entry operator and, in the alternative, that Plaintiff was not disabled at step five because the VE testified that she could work as a bakery helper or a fast food restaurant helper. (R. at 343-348.) Plaintiff filed a request for review of the ALJ's decision, (R. at 356), and submitted additional evidence to the Appeals Council. (R. at 359-374.) On March 13, 1996, the Appeals Council, remanded the case to the ALJ to re-evaluate the medical source opinions and articulate his interpretation of medical source ratings of fair, to complete the Psychiatric Review Technique Form, and to obtain supplemental vocational expert testimony, if warranted. (R. at 375-377.) On remand, the ALJ held a supplemental hearing on September 21, 1998 at which Plaintiff appeared and was represented by counsel. (R. at 82-141.) Plaintiff, her mother, and Kevin Davis, a VE, testified. (R. at 82.)

4.      The ALJ issued his second decision on December 1, 1998. (R. at 20-26.) The ALJ determined that Plaintiff had disability insured status through June 30, 1998. (R. at 20.) The ALJ analyzed Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f); 416.920(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). At the first step

of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in post-onset date substantial gainful activity, but that she was employed in a part-time position in a fast food restaurant that did not qualify as substantial gainful activity.  (R. at 20; 25-26.)  At the second step, the ALJ determined that Plaintiff had a severe impairment or combination of impairments of dysthymia and atypical personality disorder with schizoid features, but did not have a severe impairment with regard to mental retardation.  (*Id.*)  At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R.  §§ 404.1501-.1599.  (R. at 20-21.)  The ALJ then found that Plaintiff had the residual functional capacity for at least a wide range of simple, non-public, one and two step work, with limited contact with co-workers. (R. at 24.)  The ALJ determined at step four that Plaintiff was unable to return to her past relevant work as a data entry operator.  (R. at 25.)  At step five, relying on the testimony of a vocational expert, the ALJ determined that Plaintiff was able to perform the jobs of candy cutter, housekeeper, kitchen helper, and ware cleaner, because these jobs were less stressful that her current part-time position in the fast food restaurant.  (R. at 25-26.)

5.     Plaintiff filed a request for review of the ALJ's decision, (R. at 13), and submitted additional evidence to the Appeals Council.  (R. at 438-450.)  On November 24, 2000, the Appeals Council, after considering the additional evidence, denied the request for review.  (R. at 6.)  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On December 18, 2000, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

3

**Standard of Review**

6.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

7.      In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. §423(d)(1)(A)).

8.      At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R.§§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *See id.*

**Administrative Record**

9.      On December 3, 1993, Plaintiff presented to the Family Health Center, complaining of forgetfulness, weight loss, sleeplessness, an inability to learn in school, cold symptoms, and headaches.  (R. at 238.)  Plaintiff denied using alcohol or drugs, but reported that she dropped out of the Technical-Vocational Institute because she "couldn't get it."  (R. at 236- 238)  Plaintiff lived with her parents and worked three hours a day at a fast-food restaurant.  (*Id.*)  Plaintiff went to aerobics once a week, had no boyfriend and few friends.  (*Id.*)  Plaintiff stated that she felt depressed and had "something that bothers [her] that she can't talk about."  (*Id.*)  Plaintiff was diagnosed with probable depression, a possible eating disorder, and was prescribed Desipramine[1], an anti-depressant. (R. at 230; 237.)  Plaintiff received mental health treatment every few months at the Family Health Center through December 1994.  (R. at 227-246.)

10.     From April 28, 1994 to November 3, 1994, Plaintiff underwent court-ordered counseling for a shoplifting charge at Catholic Social Services.  (R. at 257-295.)  Plaintiff had been shoplifting since age 18 and was last arrested on November 7, 1993. (R. at 265; 272.)  If she re-offended, she was at risk of a felony charge.  (*Id.*)  During counseling, Plaintiff's mother expressed anxiety that Plaintiff had substantially changed after age 25 and that mental illness ran in the family. (R. at 263.)  Plaintiff's mother elaborated that Plaintiff was confused, overreacted to minor conflicts, was easily startled, was suspicions that people were talking about her, and had visual hallucinations. (*Id.*)  Plaintiff's mother was concerned that Plaintiff's memory and comprehension were deteriorating and that her problems with work were increasing.  (R. at 262.)  Plaintiff's counselor made repeated

---

[1]Desipramine is indicated for the treatment of depression.  (PHYSICIANS' DESK REFERENCE 1371 (54th ed. 2000).

referrals for Plaintiff to receive a complete psychiatric evaluation, but Plaintiff resisted the referral. (R. at 257.)  At the time the counseling sessions concluded, Plaintiff felt more self-esteem and was no longer depressed. (*Id.*)

11.     Dr. Carlos Balcazar, M.D. performed a consultative examination on July 6, 1994.  (R. at 223.)  Dr. Balcazar noted that it was difficult to obtain information from Plaintiff, but he was able to ascertain that Plaintiff had some difficulties in learning and that her co-workers were bossing her around and making fun for her. (R. at 223.)  Dr. Balcazar determined that in late 1993 Plaintiff had suffered a depressive episode that had been controlled with treatment. (*Id.*)  The file indicated that Plaintiff might have an eating disorder, but she denied any problems with eating. (*Id.*)

12.     Dr. Balcazar wrote that Plaintiff was born, raised, and graduated from high school in California.  (R. at 223.)  She had difficulty learning, but was not placed in special education classes. (*Id.*)  Plaintiff worked as a keypunch operator for eleven years while living with her parents in California.  (*Id.*) She married at age 18, but left her husband three years later because he was abusive. (R. at 224.)  In 1991, Plaintiff and her family relocated to Albuquerque.  (*Id.*)  In 1992, Plaintiff obtained a part-time job cleaning a fast-food restaurant called Rex's Hamburgers. (*Id.*)

13.     Dr. Balcazar noted that Plaintiff had difficulty understanding and would give irrelevant responses.  (R. at 224.)  Dr. Balcazar interpreted her difficulty in communication to low intellectual capacity.  (*Id.*)  Plaintiff's attention span and ability to concentrate were good, she communicated affect, and her emotional reaction was appropriate.  (*Id.*)  Her intelligence appeared to be in the low average range. (*Id.*)  Her line of thought was circumstantial, but she was not delusional and denied hallucinatory experiences. (*Id.*)  Dr. Balcazar diagnosed possible dysthymic disorder, without overt problems.  (*Id.*)  Dr. Balcazar had doubts about Plaintiff's ability to organize a work sequence, but

6

believed she could use tools and materials for simple jobs and could perform one or two step repetitive tasks at a competitive rate, but would have difficulty interacting with co-workers and supervisors.  (R. at 225.)

14.     On January 15, 1995, Plaintiff began treatment at the University of New Mexico Mental Health Center.  (R. at 329-331.) Plaintiff reported that she had previously worked as a keypunch operator in California for ten years with no problems, but as of January 1995, she spent her days watching soap operas and playing bingo.  (R. at 329.)  She had no social life and did not date. (*Id.*)

15.     Dr. P.W. Kodituwakku, Ph.D. of the UNM Mental Health Center performed a neurological consultative evaluation of Plaintiff on March 14, 1995, administering several psychological tests.  (R. at 297-300.)  Plaintiff demonstrated deficits in several areas of cognitive function, including tasks requiring visual scanning, focusing attention and manual speed.  (R. at 298.) Plaintiff's Full Scale IQ was measured at 75, pacing her in the borderline range.  (R. at 298.)  The scatter of sub-test scores indicated poor performance on tests involving complex information processing and retrieval of information.  (*Id.*)  Plaintiff's spontaneous speech was fluent and grammatical, but she showed difficulty quickly organizing verbal responses under specific restraints and exhibited difficulties in attention and in the acquisition of new information.  (R. at 298-299.) Plaintiff also had trouble with complex tasks involving perceptional analysis and constructions.  (R. at 300.)  Manual speed was slow bilaterally.  (*Id.*)

16.     On the neuro-behavioral scale, Plaintiff rated at severe for depressive mood, suspiciousness, emotional withdrawal, guilty feelings, poor planning, and tension.  (R. at 299.) Dr. Kodituwakku noted that Plaintiff had unusual thought content, memory deficits, inattention,

expressive deficits, and hostility. (*Id.*) Her profile contained elevations on schizotypal and avoidant characteristics, consistent with individuals exhibiting marked deficits in interpersonal relationships. (*Id.*) Plaintiff also reported paranoid ideation, auditory hallucinations, anxiety, and depression. (*Id.*) Dr. Kodituwakku concluded that Plaintiff suffered from cognitive deficits and severe emotional difficulties consistent with a schizotypal personality and recommended a combination of behavioral and pharmacological therapies. (R. at 300.)

17.    On May 15, 1995, Dr. Parvaneh Baktiar, M.D., of the UNM Mental Health Center, completed a Medical Assessment of Ability to Do Work Related Activities (Mental) Form, rating Plaintiff's ability to deal with the public, use judgment, interact with supervisors and maintain attention/concentration at fair, and her ability to deal with work stresses and function independently at poor to none. (R. at 302.) Plaintiff's ability to understand, remember and carry out detailed, but not complex job instructions and her ability to relate predictably in social situations was rated as fair and her ability to understand, remember and carry out complex job instructions was rated at poor to none. (R. at 303.)

18.    On April 6, 1995, Dr. Melissa Martinez, of the Family Health Center, completed a Medical Assessment of Ability to Do Work Related Activities (Mental) Form, rating Plaintiff's ability to relate to co-workers, and deal with the public at poor to none, and her ability to use judgment, interact with supervisors and deal with work stresses at fair. (R. at 254.) Plaintiff's ability to understand, remember and carry out complex and simple job instructions was rated at good. (R. at 255.) Plaintiff's ability to behave in an emotionally stable manner and relate predicably in social situation was rated at poor to none and her ability to maintain personal appearance and demonstrate reliability was rated at fair. (*Id.*) Dr. Martinez noted that Plaintiff scored 29/30 on a mental status

examination, but that she had an odd affect and appeared to have deteriorated since Dr. Martinez first saw her in December 1993. (R. at 254; 256.)

19.      In April 1995, during treatment at the UNM Mental Health Center, Plaintiff was panicky, confused and reported being depressed since November 1994. (R. at 317.) Plaintiff lived with her parents and worked three hours every other day at Rex's Hamburgers. (R. at 317; 370.) She had been hit by a car when she was ten years old, lost consciousness, and was in the hospital for a few days. (Id.) Plaintiff's uncle and two cousins suffered from schizophrenia. (R. at 319.) Plaintiff was divorced and had no children. (Id.) On April 28, 1995, Plaintiff was diagnosed at UNM Mental Health Center with psychosis, schizotypal personalty disorder and borderline mental retardation. (R. at 370.) Dr. Siegfried, M.D. prescribed Mellaril. [2] (R. at 369.)

20.      On May 18, 1995, Dr. Baktiar of the UNM Mental Health Center, noted that Plaintiff was developmentally disabled, had borderline mental retardation, and was moderately ill. (R. at 309.) On June 8, 1995, Plaintiff's concentration had improved, she was less suspicious and more engaged in routine activities. (R. at 366.) Plaintiff was well-groomed and accompanied by her mother. (Id.) Her affect was mildly inappropriate and child-like. (Id.) On September 14, 1995, Plaintiff was referred for outreach services to assess her social support system and discuss an application for benefits. (R. at 362-363.) On September 28, 1995, the case worker met with Plaintiff and her mother, confirmed that Plaintiff had applied for Social Security benefits, observed no signs of gross psychiatric decompensation, and noted that Plaintiff enjoyed a good family support system. (R. at 361.)

---

[2] Mellaril, also known as thioridazine, is indicated for the management of psychotic disorders. *See* Listing for Thioridazine (Mellaril) at www.psyweb.com/Drughtm/thiori.html; PHYSICIANS' DESK REFERENCE 2842 (54th ed. 2000).

21.     On December 21, 1995, Dr. Siegfried, also of the UNM Mental Health Center, continued Plaintiff's medication.  (R. at 369.)  On March 14, 1996, Plaintiff was doing well and reported a decrease in stress at work due to the transfer of a co-worker.  (R. at 360.)  She was neatly dressed, well-groomed, and cooperative. (*Id*.)  Plaintiff reported occasional insomnia, but enjoyed her job and was very involved in watching "TV stories."  (*Id*.)  Plaintiff thought she heard people talking about her, but blocked the thoughts.  (*Id*.)

22.     On June 13, 1996, Plaintiff and her mother attended a counseling session at the UNM Mental Health Center.  (R. at 359.)  Plaintiff's mother reported that Plaintiff had mood swings, sudden rages, misinterpreted events and assumed the worst.  (*Id*.)  Her mother reported that Plaintiff had an abusive marriage when she was 17 years old and was scared when people came into a room suddenly. (*Id*.)

23.     On June 2, 1997, Plaintiff reported during treatment at the UNM Mental Health Center that she heard multiple voices and felt more stressed at work.  (R. at 388.)  Plaintiff was prescribed Trilafon[3] (R. at 387.)  On July 3, 1997, Plaintiff reported an increase in stress, but that she was still able to work part-time.  (R. at 384.)  Plaintiff's dosage of Trilafon was increased. (*Id*.)  Plaintiff's Multidisciplinary Treatment Team assessed Plaintiff's GAF[4] score at 51 on July 3, 1997. (*Id*.)

---

[3]Trilafon, also known as perphenazine, is indicated for the management of the manifestations of psychotic disorders.  PHYSICIANS' DESK REFERENCE 2842 (54th ed. 2000).

[4]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.

24.     On September 11, 1997, Plaintiff's Trilafon dosage was reduced due to side effects of dizziness and anxiousness.  (R. at 383.)  Plaintiff continued to experience auditory hallucinations and ideas of reference.  (*Id*.)  Plaintiff's Multidisciplinary Treatment Team assessed Plaintiff's GAF score at 51 on October 30, 1997.  (*Id*.)  On November 13, 1997, Plaintiff reported she was sleeping better.  (R. at 382.)  She had good hygiene, was able to follow the interviewer, but reported that people were talking about her.  (*Id*.)  On February 19, 1998, Plaintiff was feeling less depressed, but continued to report symptoms of paranoia and audio hallucinations.  (R. at 380.)  Plaintiff got depressed when people at work yelled at her or when she forgot things.  (R. at 381.)  Plaintiff was afraid old boyfriends would show up to do something or that people would talk about her.  (*Id*.)

25.     Dr. Balcazar performed a second consultative examination on July 21, 1998.  (R. at 401-408.)  Dr. Balcazar noted that Plaintiff was very vague and it was difficult to find out what was bothering her.  (R. at 401.)  Dr. Balcazar attributed these problems to Plaintiff's low intellectual capacity.  (*Id*.)  Plaintiff complained of headaches and that co-workers complained she was too slow. (*Id*.)  Plaintiff also believed that people would talk about her.  (*Id*.)  Plaintiff denied that she could hear voices when she was by herself.  (R. at 402.)  Plaintiff was unable to explain why she was going to the UNM Mental Health Center, other than to state that she was going there to see if she could improve her memory and reduce her headaches.  (*Id*.)  Plaintiff related that at times she felt down because of what she was doing at work, but Dr. Balcazar was unable to find any overt signs of depression.  (*Id*.)  Dr. Balcazar noted that Plaintiff was taking Klonopin,[5] perphenazine,[6] and

---

[5] Klonopin is prescribed to treat seizure disorders and panic disorders. PHYSICIANS' DESK REFERENCE 2646 (54th ed. 2000).

[6] Perphenazine, also known as Trilafon, is indicated for the management of the manifestations of psychotic disorders. PHYSICIANS' DESK REFERENCE 2842 (54th ed. 2000).

benztropine.[7]  (R. at 402.)  Dr. Balcazar opined that  Plaintiff was mostly unchanged since 1994, but may have been slightly better. (*Id*.)

26.     Plaintiff had difficulty providing precise information, but her attention span, ability to concentrate, and emotional reaction were good.  (R. at 403.)  Plaintiff's memory was impaired and her intelligence appeared to be in the low average range.  (*Id*.)  Dr. Balcazar detected no loose associations and no delusional thinking.  (*Id*.)  Sensorium was clear and Plaintiff denied having clear auditory hallucinations.  (*Id*.)  Dr. Balcazar agreed with Dr. Kodituwakku's opinion that Plaintiff had a schizotypal personality.  (R. at 403.)  Dr. Balcazar concluded that Plaintiff did not have any overt signs of depression or any psychotic symptoms and diagnosed a possible dysthymic disorder, an atypical personality disorder, and assessed her GAF at 80.  (*Id*.)  He opined that Plaintiff had adequate judgment to plan a simple work sequence, could use tools and materials for simple jobs, and could perform one or two-step repetitive tasks at a competitive rate, but might have difficulty in her interaction with co-workers and supervisors.  (R. at 403-404.)

27.     Dr. Balcazar completed a Medical Assessment of Ability to Do Work Related Activities (Mental) Form, rating Plaintiff's ability to relate to co-workers, use judgment and function independently at poor to none, and her ability to follow work rules, interact with supervisors, deal with work stresses and maintain attention/concentration at fair.  (R. at 406.)  Plaintiff's ability to understand, remember and carry out detailed and complex job instructions was rated at poor to none. (*Id*.)  Dr. Balcazar rated Plaintiff's ability to relate predictable in social situations and to demonstrate reliability at fair.  (R. at 407.)

---

[7]Benztropine is used as an adjunct in treatment of parkinsonism and in control of extrapyramidal disorders due to neuroleptic drugs. PHYSICIANS' DESK REFERENCE 1758-59 (54th ed. 2000).

28.     At the first hearing, held on May 23, 1995, Plaintiff testified that she lived with her parents, worked part-time at Rex's Hamburgers, (R. at 56), helped her mother with household chores, (R. at 57), drove her car everyday, (R. at 98), went shopping, (R. at 105), and went to the gym three times a week to exercise.  (R. at 56.)  Plaintiff visited her extended family regularly with her parents.  (R. at 52.)

29.     Plaintiff testified that the manager at the fast-food restaurant had asked her to leave a few times, but always allowed her to come back the next day.  (R. at 46.)  Plaintiff fought with her co-workers because they made her feel guilty.  (R. at 63.)  When she worked as a key punch operator in California, her efficiency decreased and she was not keeping up toward the end of her employment. (R. at 47.)  Plaintiff was unable to learn and had a bad memory.  (R. at 49.) Judith Beard, the VE at the first hearing, testified in response to the ALJ's first hypothetical question that a person with Plaintiff's characteristics could perform the jobs of office helper, hand packager, and shuttle bus operator. (R. at 73-74.)

30.     At the second hearing, held on September 21, 1998, Plaintiff testified that she still had the part-time job at Rex's and still lived with her parents.  (R. at 86-87.)  She did not look for a full-time job because she got headaches after working for three hours at Rex's and she was very bad at math. (R. at 93-95.)  Plaintiff was seeing a doctor about every three months and her medications did not cause any side effects.  (R. at 96-97.)

31.     Once in a while, Plaintiff went to Las Vegas with her parents, but she did not have a boyfriend or very many friends.  (R. at 100-101.)  Plaintiff went to church almost every week, occasionally went to the movies, and played bingo with her parents.  (R. at 101-102.)  Sometimes she would read the newspaper and help her mother with housework. (R. at 103-105.) Plaintiff testified

that she was treated very badly at work, that she heard voices, and that people would talk about her. (R. at 110-111.)  Plaintiff felt depressed and napped during the day.  (R. at 112-113.)

32.     Plaintiff's mother testified that Plaintiff's mental condition began to deteriorate when Plaintiff was working as a key punch operator in California.  (R. at 115.)  Plaintiff's performance slowed and she got lost going to work when she was 25 years old.  (R. at 116.)  Plaintiff's mother had her medically evaluated and the doctor said she should not be working.  (*Id*.)  After the move to Albuquerque, Plaintiff enrolled in a computer class, but was unable to keep up with the course work. (R. at 117.)  In late 1993, Plaintiff became very strange; she started pulling out her hair and stated that she wanted to kill herself. (R. at 118.)  Plaintiff would pile newspapers in her room.  (R. at 119) Trilafon helped, but when Plaintiff stopped taking it, she would scream and shake when her parents walked into the room.  (R. at 120.)

33.     Plaintiff's manager at Rex's knew that she had a problem, but allowed her to work part-time. (R. at 121.)  Plaintiff stayed with her mother constantly and did not go anywhere by herself. (R. at 122.)  Plaintiff was not interested in anything and could not discuss movies that she saw.  (R. at 123.)  At bingo, Plaintiff's mother had to help her with the numbers.  (R. at 124.)  Plaintiff was unable to learn how to take phone orders or run the cash register at Rex's and they would not want her to work full-time.  (R. at 124.)  After working for three hours cleaning tables, Plaintiff would come home exhausted.  (R. at 125.)

34.     The ALJ asked Kevin Davis, the VE at the second hearing, to assume an individual with the age educational background and experience of Plaintiff, limited in thought, with no particular physical limitations, able to engage in simple one and two step tasks, unable to work with the public and able to engage in only limited contact with co-workers.  (R. at 129.)  Mr. Davis testified that a

person with such characteristics could perform the jobs of candy cutter, cleaner/housekeeping, kitchen helper, and ware cleaner. (R. at 129-130.)

35.     Plaintiff's attorney asked Mr. Davis to further assume that such a person would have difficulty interacting with co-workers and supervisors, and the ability to follow work rules, follow instructions, relate to supervisors, demonstrate reliability and relate predictable in social situations was seriously limited but not precluded and had no useful ability to relate to co-workers. (R. at 133.) Mr. Davis testified that such a person would probably not be able to perform the jobs he had listed. (*Id.*)

36.     The ALJ then asked Mr. Davis whether the jobs of candy cutter, cleaner/housekeeping, kitchen helper, and ware cleaner placed any greater demands than working in a fast-food restaurant cleaning tables, cleaning bathrooms, occasionally carrying out trays of food, and working with a crew of five individuals, a position held by Plaintiff at Rex's. (R. at 134.) Mr. Davis testified that the demands of the jobs would place no greater, and perhaps lesser, demands on a person than Plaintiff's job in the fast-food restaurant. (R. at 134.)

**Analysis**

37.     Plaintiff argues that the Commissioner failed to meet his burden at step five for three reasons; the ALJ=s mental residual functional capacity determination is not supported by substantial evidence and is contrary to law, reliance on Plaintiff's part-time employment to support a finding on non-disability is contrary to law, and the ALJ's credibility determination is not supported by substantial evidence and is contrary to law.

38.     Plaintiff contends that the ALJ's assessment of Plaintiff's mental RFC is not supported by substantial evidence.   When the listing requirements have not been met, the determination of

15

mental residual functional capacity is crucial to the evaluation of an individual's ability to perform substantial gainful work activity. *Cruse v. Dept. of Health & Human Servs.,* 49 F. 3d 614, 619 (10th Cir. 1995); *Washington v. Shalala,* 37 F. 3d 1437, 1440 (10th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00(A). In assessing a claimant's mental residual functional capacity, the ALJ should consider, among other things, the claimant's ability to engage in the activities of daily living, to interact appropriately with the public, supervisors and co-workers, to focus long enough to compete tasks in a timely manner, and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder. *Washington v. Shalala*, 37 F. 3d at 1440.

39.     In this case, the ALJ considered the *Washington* factors and determined that Plaintiff had the residual functional capacity for at least a wide range of simple, non-public, one and two step work, with limited contact with co-workers. (R. at 21-24.) The ALJ prepared a Psychiatric Review Technique Form, finding that Plaintiff had slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, seldom had deficiencies of concentration, persistence of pace, and never had an episode of deterioration or decompensation in a work-like setting. (R. at 25; 27-29.) These findings are not supported by substantial evidence

40.     Substantial evidence of record establishes that Plaintiff suffered from severe cognitive and psychological impairments. Most telling are Plaintiff's treatment records. Plaintiff received mental health treatment for probable depression at the Family Health Center beginning in 1993. (R. at 236-246.) Plaintiff subsequently underwent court-ordered counseling at Catholic Social Services after she was arrested for repeated shoplifting. (R. at 247-262.) Plaintiff subsequently received long-term treatment at the University of New Mexico Mental Health Center, where her significant mental health

problems were documented and Plaintiff was prescribed significant psychoactive medications. (R. at 309; 360-369; 384; 388.)

41.     Dr. Kodituwakku measured Plaintiff's IQ at 75 and noted that she suffered from cognitive deficits and severe emotional difficulties consistent with a schizotypal personality. (R. at 300.) In July and October 1997, Plaintiff's interdisciplinary treatment team at the UNM Mental Health Center assessed her GAF score at 50 and 51. (R. at 383-384.) The DSM-IV defines a GAF of 50 to 41 as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders DSM-IV at 32 (4th ed.1994). Plaintiff's treatment records demonstrate that the ALJ's assessment of her mental residual functional capacity is not supported by substantial evidence.

42.     The consultative reports, when fully considered, also undermine the ALJ's assessment of Plaintiff's mental residual functional capacity. In 1994, Dr. Balcazar concluded that Plaintiff could use tools and materials for simple jobs and could perform one or two step repetitive tasks at a competitive rate, but would have difficulty interacting with co-workers and supervisors. (R. at 225.) In 1998, Dr. Balcazar assessed Plaintiff's GAF at 80, indicating that if symptoms are present, they are transient and expectable reactions to psychosocial stressors representing no more than slight impairment to social, occupational or school functioning. (R. at 403) Dr. Balcazar concluded that Plaintiff had adequate judgment to plan a simple work sequence, could use tools and materials for simple jobs, and could perform one or two step repetitive tasks at a competitive rate, but might have difficulty in her interaction with co-workers and supervisors. (R. at 403-404.)

43.     However, on the Medical Assessment of Ability to Do Work Related Activities

(Mental) Form, Dr. Balcazar rated Plaintiff's ability to relate to co-workers, use judgment and function independently at poor to none, and her ability to follow work rules, interact with supervisors, deal with work stresses and maintain attention/concentration at fair.  (R. at 406.)  Plaintiff's ability to understand, remember and carry out detailed and complex job instructions was rated at poor to none.  (*Id*.)  Dr. Balcazar rated Plaintiff's ability to relate predictable in social situations and to demonstrate reliability at fair.  (R. at 407.)  The ALJ disregarded the form because he believed it was inconsistent with Dr. Balcazar's narrative report and the record as a whole.  (R. at 22.)  This was error.

44.     Finally, the hearing testimony undercuts the ALJ's mental residual functional capacity determination.  Plaintiff's mother reported that Plaintiff acted strangely and at times claimed to hear voices, she piled newspapers in her room and would easily get lost.  (R. at 116-120.)  Plaintiff was let go from her job as a baker's helper because she put the bar code stickers on the top of the cake boxes because they "looked prettier," thus requiring the checker to turn the cakes upside down to scan them.  (R. at 120.)  At Rex's, Plaintiff was unable to learn how to take phone orders or run the cash register and they would not want her to work full-time.  (R. at 124.)  After working for three hours cleaning tables, Plaintiff would come home exhausted.  (R. at 125.)  Plaintiff testified that her manager at Rex's had sent her home during her shift due to her behavior, (R. at 46), and that she fought with her co-workers because they made her feel guilty.  (R. at 63.)  This testimony refutes the ALJ's determination that Plaintiff never had an episode of deterioration or decompensation in a work-like setting.

45.     In sum, the ALJ's determination that Plaintiff had only a slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, seldom had deficiencies of

concentration, persistence of pace, and never had an episode of deterioration or decompensation in a work-like setting is not supported by substantial evidence.  Thus, a remand is required.

46.     The ALJ also erred in disregarding the opinions of Dr. Baktiar and Dr. Martinez.  The treating physicians rated Plaintiff at fair or poor to none in several categories on the Medical Assessment of Ability to Do Work-Related Activities Form.  (R. at 254-256; 301-304).  Dr. Baktiar rated Plaintiff's ability to deal with the public, use judgment, interact with supervisors and maintain attention/concentration ability to understand, remember and carry out detailed, but not complex job instructions and relate predictably in social situations at fair, and her ability to deal with work stresses, function independently, understand, remember and carry out complex job instructions at poor to none. (R. at 302-303.)   Dr. Martinez rated Plaintiff's ability to use judgment, interact with supervisors, deal with work stresses, maintain personal appearance and demonstrate reliability at fair, and her ability to relate to co-workers, and deal with the public, behave in an emotionally stable manner and relate predicably in social situation at poor to none. (R. at 254-255).

47.     The Tenth Circuit has held that the term "fair" as used on the Medical Assessment of Ability to Do Work-Related Activities Form is evidence of disability.  *Cruse v. Dept. of Health & Human Servs.,* 49 F. 3d at 618.   The ALJ may disregard the opinion of a treating physician where it is unsupported by relevant evidence, inconsistent with the record as a whole, or if other factors contradict the opinion.  *See Goatcher v. Shalala*, 52 F. 3d 288, 290 (10th Cir. 1995).  The ALJ discounted Dr. Baktiar's ratings because he believed were inconsistent with the rest of the medical record and Plaintiff's daily activities.  (R. at 23-24.)  However, Dr. Baktiar's ratings were consistent with Dr. Kodituwakku's report and Plaintiff's treatment records at the UNM Mental Health Center. Thus, the ALJ's analysis of Dr. Baktiar's rating is not supported by substantial evidence.

19

48.     The ALJ did not discuss Dr. Martinez's ratings on her Medical Assessment of Ability to Do Work-Related Activities Form.  (R. at 254-256).  On remand, the ALJ should fully consider, and discuss, Dr. Martinez's findings.

49.     Similarly, Plaintiff was prescribed potent psychoactive medications, (R. at 309; 360-369; 384; 388), yet the ALJ failed to fully discuss the implication of such a high level of medication.  This was error.  The ALJ may not selectively cite only evidence in support of his decision, but must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence that he rejects.  *See Clifton v. Chater*, 79 F. 3d 1007, 1010 (10th Cir.1996).   In this case, the ALJ failed to fully discuss Plaintiff's high level of medication.  On remand, the ALJ should fully discuss Plaintiff's psychoactive medication.

50.     Plaintiff claims that the ALJ's reliance on her part-time employment at Rex's to support the findings that she is not disabled is contrary to law.  The ALJ determined that Plaintiff's job at Rex's did not qualify as substantial gainful activity.  (R. at 20.)  However, the ALJ did evaluate the fact that Plaintiff was employed part-time for six years in the same part-time fast-food restaurant job in assessing Plaintiff's RFC and credibility.  (R. at 22-26.)  The Social Security regulations provide that part-time work may qualify as substantial activity, even if it does not qualify as substantial gainful activity.  *See* 20 C.F.R. § 404.1572(a).  The fact that the Rex's job was part-time did not bar the ALJ from considering it.   Indeed, the ALJ is charged with considering all the evidence in his analysis.  *See, e.g., Clifton v. Chater*, 79 F. 3d 1007, 1009 (10th Cir. 1996.)  The ALJ evaluated Plaintiff's part-time employment in conjunction with the medical evidence, the testimony and Plaintiff's daily activities.  (R. at 21-25.)  This was appropriate under the regulations.  However, the ALJ did not fully develop the record with respect to Plaintiff's job at Rex's.

51.      The record indicates that Plaintiff may have performed her job at Rex's under special conditions. Work done under special conditions, such as in a sheltered workshop may or may not show that a claimant possesses "the necessary skills and ability to work at the substantial gainful activity level." 20 C.F.R. § 404.1573(c). When determining whether work was work done under special conditions, the ALJ should inquire whether the claimant received special assistance, whether she was allowed to work irregular hours, whether she was able to work only because of specially arranged circumstances, whether she was permitted to work at a lower standard of productivity or efficiency, and whether she was given the opportunity to work due to a family relationship, past association with the employer or the employer's concern for the claimant's welfare. *Id.*

52.      While the existing record indicates that Plaintiff's job at Rex's may have been performed under special conditions, the record was not fully developed with respect to the § 404.1573(c) factors. The ALJ has a duty in every case to fully develop the record. *Henrie v. United States Dep't of Health & Human Servs.*, 13 F. 3d 359, 360-61 (10th Cir.1993). On remand, the ALJ should fully develop the record on the question of whether Plaintiff's job at Rex's was performed under special conditions. Once the record is fully developed in this regard, the ALJ should reconsider the impact of Plaintiff's employment at Rex's on her RFC and credibility.

53.      Plaintiff asserts that the ALJ erred in assessing her credibility. The ALJ evaluated the medical evidence and observed that the findings of the psychiatric examiners were inconsistent with Plaintiff's limitations, (R. at 21-24), and found that Plaintiff's testimony of subjective complaints and functional limitations was not entirely supported by the evidence as a whole to the disabling degree alleged and therefore lacked credibility. (R. at 21.) The ALJ further noted that Plaintiff's daily activities and part-time employment were inconsistent with claimed limitations. (R. at 23.)

54.     "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Secretary of Health & Human Servs.*, 898 F. 2d 774, 777 (10th Cir.1990).  However, such deference is not absolute. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1490 (10th Cir.1993). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F. 2d 1125, 1133 (10th Cir.1988).  In this case, the ALJ failed to closely and affirmatively link his credibility findings to substantial evidence.  On remand, the ALJ should re-evaluate Plaintiff's credibility in light of the analysis contained herein

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 9), filed July 27, 2001, be granted and this matter remanded to the Commissioner for reevaluation of Plaintiff's residual functional capacity, for reconsideration of the opinions of treating physicians, for analysis of the Medical Assessment of Ability to Do Work-Related Activities Forms consistent with *Cruse*, for a full analysis of Plaintiff's high level of prescribed psychoactive medications, for development of the record with regard to whether Plaintiff performed her job at Rex's under special conditions, for re-evaluation of Plaintiff's job at Rex's in light of the fully developed record, and for re-revaluations of Plaintiff's credibility in accordance with the analysis contained herein.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. ' 636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may  file with the Clerk of the District Court, 333 Lomas Blvd. N.W, Albuquerque, NM 87102, written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the

proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**